UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| MARTIN J. WALSH, | ) | |
| Secretary of Labor, | ) | FILE NO. |
| United States Department of Labor, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| | ) | **Injunctive Relief Sought** |
| v. | ) | |
| | ) | |
| TRU BLUE THIRD PARTY | ) | |
| ADMINISTRATORS, LLC; | ) | |
| UNITED STATES MANAGING | ) | |
| GENERAL UNDERWRITERS, LLC; | ) | |
| GREGORY P. SANTULLI, an individual; | ) | |
| JOHN DONALD PRECOUR, an individual; | ) | |
| GEOFFREY VAUGHN GRABIAK, | ) | |
| an individual; | ) | |
| and TRU BLUE PARTICIPATING | ) | |
| HEALTH PLANS 1-50 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff MARTIN J. WALSH, Secretary of Labor, UNITED STATES

DEPARTMENT OF LABOR ("the Secretary"), alleges:

## Introduction

The Secretary is charged with enforcing the provisions of Title I of the

Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29

U.S.C. § 1001, *et seq*. In this capacity, the Secretary brings this action to remedy

breaches of the Defendants' fiduciary duties under ERISA committed in the course of their management of a multiple employer welfare arrangement ("MEWA"). The Defendants have had discretionary authority over at least 50 individual employer-sponsored, self-funded healthcare plans (the "Participating Plans") across a period of approximately three years. Although the Defendants purported to provide only administrative services to the Participating Plans through Tru Blue Third Party Administrators, LLC ("Tru Blue"), the Defendants actually administered the Participating Plans as a single self-funded MEWA.  The Defendants collected premium equivalents from individual Participating Plans, but instead of directing the Participating Plans' premium equivalents to individual plan accounts, the Defendants directed the premium equivalents into commingled accounts; the commingled premium equivalents were used to pay claims of other Participating Plans.  Once the premium equivalents were collected, the Defendants exercised plenary fiduciary control over the operation of the MEWA's ERISA plan assets.  As set forth in detail below, they engaged in violations of ERISA by operating the MEWA and managing the Participating Plans in ways that were obviously and fundamentally flawed and contrary to their ERISA-based fiduciary obligations to act with prudence and loyalty. In doing so, the Defendants have caused significant harm to the Participating Plans' participants and beneficiaries.

Defendants' flagrantly imprudent and disloyal conduct effectively stripped thousands of participants and beneficiaries, already victimized once by their previous third party administrator ("TPA") Advance Benefit Management Systems USA, Inc. ("ABMS"),, of the health coverage they were promised and for which they paid. In this action, the Secretary seeks to remedy the wrongs committed by the Defendants.

## Background

1.     The Secretary is charged with enforcing the provisions of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001 *et seq.*, which establishes, among other things, standards of conduct, responsibility, and obligations for fiduciaries of employee benefit plans.

2.     ERISA ensures "the soundness and stability of plans with respect to adequate funds to pay promised benefits." ERISA § 2(a), 29 U.S.C. § 1001(a). To protect plan investments, ERISA requires that those who manage plan assets act solely, exclusively, and prudently in the interests of plan participants. ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B).

3.     ERISA prohibits fiduciaries from using plan assets for their own benefit, ERISA § 406(b), 29 U.S.C. § 1106(b), or in transactions with or for the benefit of "parties in interest," as defined in ERISA § 3(14); 29 U.S.C. § 1002(14).

3

4.      When ERISA's strict fiduciary standards are not met, the Secretary has the authority to seek relief under ERISA §§ 409 and 502(a)(2) and (5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), to restore plan losses, to recover unjust profits, and to obtain other remedial and equitable relief. The Secretary may also seek to enjoin a breaching fiduciary from acting as a fiduciary or service provider to employee benefit plans in the future.

## JURISDICTION AND VENUE

5.      This action arises under ERISA and is brought by the Secretary to obtain relief under ERISA §§ 409 and 502(a)(2) and (5), 29 U.S.C. §§ 1109 and 1132(a)(2) and (5), to redress violations and enforce the provisions of Title I of ERISA.

6.      This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). The subject of this action is a non-ERISA-covered MEWA encompassing employer-sponsored ERISA-covered employee benefit plans (*i.e.*, the Participating Plans) to provide medical and other health and welfare benefits to employees and eligible employee dependents.

7.      Venue for this action lies in the Northern District of Georgia, Atlanta Division, pursuant to Section 502(e)(2) of ERISA, because many of the alleged breaches took place within this Court's jurisdiction, Tru Blue administers the

Participating Plans and operates the MEWA within this Court's jurisdiction, and

Tru Blue's headquarters are located at 1580 Atkinson Road, Lawrenceville,

Georgia 30043, within this Court's jurisdiction.

## PARTIES

8.     The Secretary is vested with the authority to enforce the provisions of

Title I of ERISA by, among other means, the filing and prosecution of civil claims

against fiduciaries and other parties who violate ERISA. ERISA § 502(a)(2) & (5),

29 U.S.C. § 1132(a)(2) & (5).  At all relevant times, Defendant Tru Blue operated

a MEWA within the meaning of ERISA Section 3(40)(A), 29 U.S.C. §

1002(40)(A), which provided benefits and held assets for at least 50 ERISA-

covered employee benefit plans. Throughout this Complaint, the Secretary refers to

the MEWA as the "Tru Blue MEWA," and to the ERISA-covered plans

participating in the MEWA as the "Participating Plans." Each Participating Plan

was established or maintained by an employer for the purpose of providing medical

and other health and welfare benefits pursuant to ERISA § 3(2), 29 U.S.C. §

1002(2), and is thus an employee benefit plan pursuant to ERISA § 3(3), 29 U.S.C.

§ 1002(3). Participating Plans 1 – 50 are named as defendants herein pursuant to

Rule 19(a) of the Federal Rules of Civil Procedure to assure that complete relief

can be granted.[1]

9.     Defendant Tru Blue is a privately held Texas corporation formed on or about March 25, 2019.  At all relevant times, Tru Blue exercised authority and control over the assets of the Participating Plans covered by the Tru Blue MEWA and had discretionary authority and control over the management, administration, and disposition of the assets of the Participating Plans within the Tru Blue MEWA and over the Tru Blue MEWA itself. Among other things, Tru Blue selected service providers, created and controlled bank accounts containing plan assets, caused plan assets to be used for both permissible and impermissible purposes, and exercised discretionary authority over the adjudication of claims. Therefore, Tru Blue is a fiduciary to the Participating Plans pursuant to ERISA Sections 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and it is a party in interest pursuant to ERISA Sections 3(14)(A) & (B), 29 U.S.C. § 1002(14)(A) and (B).

10.     At all relevant times United States Managing General Underwriters, LLC ("USMGU") provided underwriting services for at least 42 of the

---

1 Appendix A contains a list of Participating Plans 1 – 50.

Participating Plans,[2] and selected Tru Blue and other service providers for those Participating Plans.  Because USMGU had discretionary authority and control over the management and administration of all 50 of the Participating Plans, it was a fiduciary to those Participating Plans pursuant to ERISA Sections 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and it is a party in interest pursuant to ERISA Section 3(14)(A) and (B), 29 U.S.C. § 1002(14)(A) and (B).

11.     Defendant John Precour ("Precour" or "Defendant Precour") is a founder, Executive Vice President, and owner of USMGU. Precour co-founded Tru Blue and is a managing partner and 18.75% co-owner of Tru Blue. Among other things, Defendant Precour selected Tru Blue and other service providers for at least 42 of the Participating Plans and caused these Participating Plans to be administered by Tru Blue in or around April 2019. Defendant Precour had, and exercised, discretionary authority over all Participating Plans; therefore, Defendant Precour is a fiduciary to the Participating Plans pursuant to ERISA Sections 3(21)(A)(i) and (iii), 29 U.S.C. §§ 1002(21)(A)(i) and (iii), and he is a party in interest pursuant to ERISA Section 3(14)(A) and (H), 29 U.S.C. § 1002(14)(A) and (H).

---

[2] The 42 Participating Plans originally moved from ABMS to Tru Blue by USMGU and its owner John Precour are listed as Plans 1 through 42 on the attached Appendix A.

12.     Defendant Geoffrey Grabiak ("Grabiak" or "Defendant Grabiak") became an indirect co-owner, managing partner, and the Chief Financial Officer of Tru Blue on or about June 30, 2019. Defendant Grabiak holds and held signatory authority on some of the accounts Tru Blue maintained for the Participating Plans, which held Participating Plan assets. Beginning on or about June 30, 2019, Grabiak also made decisions about which claims to pay from Tru Blue's accounts. Because Defendant Grabiak has, and exercised, discretionary control over the management and administration of the Participating Plans and control over their assets, Defendant Grabiak is a fiduciary to the Participating Plans pursuant to ERISA Sections 3(21)(A) (iii), 29 U.S.C. §§ 1002(21)(A) (iii), and he is a party in interest pursuant to ERISA Section 3(14)(A) and (H), 29 U.S.C. § 1002(14)(A) and (H).

13.     Gregory Santulli ("Santulli" or "Defendant Santulli") became an indirect co-owner, managing partner, and President of Tru Blue on or about October 1, 2019. Defendant Santulli oversees Tru Blue's operations, including the processing and payment of claims, and performs the functions of a plan administrator. Defendant Santulli holds and held signatory authority on some of the accounts Tru Blue maintained for the Participating Plans, which held Participating Plan assets. Because Defendant Santulli has, and exercised, discretionary control over administration of the Participating Plans and had control

8

over the Participating Plans' assets, Defendant Santulli is a fiduciary to the

Participating Plans pursuant to ERISA Sections 3(21)(A)(i) and (iii), 29 U.S.C.

§§ 1002(21)(A)(i) and (iii), and he is a party in interest pursuant to ERISA Section

3(14)(A) and (H), 29 U.S.C. § 1002(14)(A) and (H).

14.     Rx Valet, LLC ("Rx Valet") served as the Pharmacy Benefits

Manager to some or all of the Participating Plans. Therefore, Rx Valet is a party in

interest pursuant to ERISA Section 3(14)(B). Rx Valet is also owned by a fiduciary

to the Participating Plans, Santulli. Therefore, Rx Valet is also a party in interest

pursuant to ERISA Section 3(14)(G), 29 U.S.C. § 1002(14)(G).

15.     Alternative Benefit Collective ("ABC") is a company of which

Defendants Santulli and Grabiak each own one-third. ABC owns 37.5% of Tru

Blue. Therefore, ABC is a party in interest pursuant to ERISA Section 3(14)(G),

29 U.S.C. § 1002(14)(G).

16.     The Agency of North Georgia Inc. ("Agency of North Georgia"),

which provided broker services to Participating Plans, is owned or partially owned

by Defendant Grabiak. Therefore, the Agency of North Georgia is a party in

interest pursuant to ERISA Section 3(14)(B) and (G), 29 U.S.C. § 1002(14)(B) and

(G).

17.     Advanced Diabetic Solutions, LLC ("Advanced Diabetic") is owned

by Defendant Santulli, a fiduciary to the Participating Plans. Therefore, Advanced Diabetic is a party in interest pursuant to ERISA Section 3(14)(G), 29 U.S.C. § 1002(14)(G).

18.     Advanced Pharmacy, LLC ("Advanced Pharmacy") is owned by Defendant Santulli, a fiduciary to the Participating Plans. Therefore, Advanced Pharmacy is a party in interest pursuant to ERISA Section 3(14)(G), 29 U.S.C. § 1002(14)(G).

## GENERAL ALLEGATIONS

### A.     The Tru Blue MEWA operated as a Multiple Employer Welfare Arrangement

19.     At all relevant times, the Tru Blue MEWA operated as a non-plan, ERISA-covered MEWA, in that it is not itself an employee welfare benefit plan but consists of multiple underlying participating employer self-insured employee welfare benefit plans. Participating employers are headquartered in at least ten states and come from a wide range of industries. There is no evidence of common control among the participating employers, nor any cohesive bond. Participating employers are heterogeneous and unrelated, with their only common purpose being a shared desire for employee medical coverage.

20.     Although the Tru Blue MEWA is not itself an ERISA-covered plan, employers sponsor the Participating Plans that comprise the Tru Blue MEWA.

10

Each Participating Plan is covered by ERISA pursuant to ERISA Section 4(a), 29 U.S.C. § 1003(a)and is subject to Title 1 of ERISA, which imposes fiduciary responsibilities on the Tru Blue MEWA and the entity and individuals administering it, i.e., Tru Blue, Grabiak, Santulli, and Precour.

21.     The Participating Plans obtained medical and other health and welfare benefits, including prescription drug benefits for their employees, through their participation in the Tru Blue MEWA. The Tru Blue MEWA offered different coverage options as well as different auxiliary services, such as Medical, Dental, and Vision Plan Administration, for the Participating Plans to select. The entity and individuals administering the Tru Blue MEWA – Tru Blue, Grabiak, Santulli, and Precour – selected service providers for the Tru Blue MEWA.

22.     The Participating Plans were "level-funded" health benefit plans, which blend elements of fully-insured and self-funded plans. With "level-funded" plans, sponsoring employers of the Participating Plans obtain two forms of stop-loss insurance policies: (1) specific coverage; and (2) aggregate coverage. Specific coverage insures claims for a covered individual once that individual's claim accruals exceed a specific value outlined in the stop-loss agreement, known as the "attachment point." Aggregate coverage insures coverage of all claims once the employer's claims total has reached an aggregate attachment point specified in the

stop-loss agreement. The employer is responsible for funding all claims that do not meet either the specific or aggregate attachment points.

23.     The sponsoring employers created the Participating Plans with the intent to provide benefits, and the Participating Plans have an identifiable class of beneficiaries, a source of financing, and procedures for obtaining the benefits. When sponsoring employers transfer employee and employer contributions to the Tru Blue MEWA on behalf of the Participating Plans, it is the employers' intent that these contributions are to be used to pay claims and necessary and reasonable administrative expenses.

## B.     Tru Blue and Tru Blue MEWA's Formation

24.     In approximately May 2019, Advance Benefit Management Systems USA, Inc. ("ABMS"), a South Carolina TPA that administered individual, self-funded employer plans, collapsed in the middle of a plan year due to rampant mismanagement and misappropriation of funds.[3]

25.     Defendant Precour's company, Defendant USMGU, was the underwriter for 42 of the plans being administered by ABMS per arrangements

---

3 The Secretary filed suit against ABMS and its principals on May 1, 2020, *see Scalia v. Advance Benefit Management Systems USA, Inc. et al,* Case No. 2:20-cv-00106-RWS (N.D. GA).  This matter was resolved via consent judgment on February 14, 2022.

made through USMGU.

26.     Around March 2019, aware of the mismanagement and misappropriation plaguing ABMS and foreseeing ABMS' collapse, Precour partnered with ABMS's former President to form Tru Blue.

27.     Precour and USMGU unilaterally selected Tru Blue to be the new TPA for those 42 plans without the Plan Sponsors' permission or, in some cases, knowledge. Those 42 plans became the first of the Participating Plans in the Tru Blue MEWA.[4]

28.     Precour and USMGU notified those 42 Plans they would be administered by Tru Blue in letters to Plan Sponsors dated April 16, 2019, and to brokers dated April 17, 2019. These letters did not seek the Plan Sponsors' permission for their Plans to be administered by Tru Blue. Instead, the letters simply informed the Plan Sponsors that their Plans were moving to Tru Blue and directed the Plan Sponsors to enter into new written agreements with Tru Blue.

29.     Precour and USMGU presented the move to Tru Blue as a *fait accompli* to the Plan Sponsors.

---

4 The first 42 Participating Plans are listed as Plans 1 through 42 on attached Appendix A. The remaining nine Participating Plans were not previously administered by ABMS and did not become covered by the Tru Blue MEWA until the 2020 plan year or later. These later-added Plans are listed as Plans 43 through 50 on attached Appendix A.

30.     Neither Precour nor USMGU took steps to ensure Tru Blue could capably administer these 42 Participating Plans.

31.     When some Plan Sponsors questioned or objected to using Tru Blue to administer their Plans, Precour informed those Sponsors that their failure to accept Tru Blue as the Plans' TPA would result in severe consequences, such as claims going unpaid, lapses in health plan coverage, voiding the Plans' stop loss coverage, causing excessive delays, incurring substantial fees, and more.  In at least one case, upon learning that a Plan Sponsor wished to leave the Tru Blue MEWA, Precour stated that a specific participant's claims would go unpaid if it did so.

32.     As a result of Precour and USMGU's decision to move the 42 Participating Plans to Tru Blue, USMGU continued to receive monthly fees from the Participating Plans for marketing and managing the Nationwide stop loss product on behalf of the True Blu MEWA; these monthly fees were not adequately disclosed to the Plan Sponsors.

33.     In addition to the undisclosed monthly fees USMGU received from Participating Plans, USMGU had a profit-sharing arrangement with Nationwide. Under the terms of this arrangement, USMGU receives 40% of the profit from the stop loss premiums if the profit from those premiums is greater than $2 million.

34.     This profit-sharing arrangement, in addition to the undisclosed monthly fees it received from the Participating Plans, created a financial interest for USMGU to keep the Participating Plans with a Nationwide-linked TPA – such as Tru Blue – following ABMS's demise.

35.     However, neither USMGU nor Precour disclosed its monthly fees  or the profit-sharing arrangement with Nationwide to the Participating Plan Sponsors.

36.     Tru Blue began administering the first 42 Participating Plans on or about May 1, 2019.

37.     On or about July 1, 2019, ABC – a company co-owned by Defendants Santulli and Grabiak – purchased a 37.5% ownership interest in Tru Blue.

38.     Thus, on or about July 1, 2019, Defendant Grabiak, through his one-third ownership interest in ABC, became a Tru Blue co-owner. He also became Tru Blue's Chief Financial Officer (CFO) on the same date.  Defendant Grabiak is currently a co-owner of Tru Blue and its CFO.

39.     On or about July 1, 2019, Defendant Santulli, through his one-third ownership of ABC, became a Tru Blue co-owner.  Defendant Santulli became Tru Blue's President in early October 2019 and is its President to date.

**C.     The Tru Blue MEWA's Theoretical Design**

40.     The Tru Blue MEWA's purported funding model for the Participating

Plans was that each employer/Plan Sponsor paid healthcare expenses incurred by its own plan's participants and beneficiaries up to an "attachment point," after which the claims were insured under a "stop-loss" insurance plan.

41.     USMGU selected Nationwide Mutual Insurance Company ("Nationwide") to be the stop-loss carrier for the first 42 of the Participating Plans when they were being administered by ABMS and then again under Tru Blue.

42.     Under the funding model used by ABMS and then by the Tru Blue MEWA, the Participating Plans were "level-funded."  That is, each Plan Sponsor paid the non-insured amount of its expected healthcare claims to a third-party administrator in twelve monthly payments each plan year.  The Plan Sponsors did not pay claims as they were incurred.

43.     Tru Blue was expected to hold those funds ("Claims Funds") until they were needed to pay claims submitted by healthcare providers.

44.     The Plan Sponsors of the first 42 Participating Plans did not create new Plan Documents under the Tru Blue MEWA.  Instead, the Plan Sponsors executed Notices of Adoption with Tru Blue by which they adopted the same premium equivalent rates and monthly Claims Fund contributions that they previouslypaid to ABMS.

45.     When Tru Blue began to administer the first 42 Participating Plans in

16

May 2019, it entered into Administrative Service Agreements ("ASA") with the Participating Plans.

46.    Many of the ASAs either were missing material information or contained materially incorrect information.  For example, some ASAs did not have any effective date set forth, while the others had effective dates with Tru Blue of March 1, 2019 – before Tru Blue even existed.

47.    The ASAs imposed regular recordkeeping requirements on Tru Blue. For example, Tru Blue was required to submit a "monthly account of payments made in sufficient detail to provide for the audit and control of funds used" to each Plan Sponsor. Tru Blue was also responsible for maintaining bank records and providing those records to Plan Sponsors upon request.

48.    Per the ASAs, Tru Blue had no responsibility or authority to pay or process any of those claims incurred prior to May 1, 2019 ("run-in claims"), when Tru Blue began to administer the Participating Plans.  The ASAs provided neither a mechanism for Tru Blue to administer the run-in claims nor any provision for funding the run-in claims.  Instead, the ASAs specifically state that the Plan Sponsors "assume the responsibilities for claims and claims administration which occurred prior to the effective date of the agreement" – in other words, the run-in claims. In letters sent to Plan Sponsors on December 10, 2019, Tru Blue

acknowledged it paid approximately $506,066.97 in ABMS era claims.

49.     Additionally, the ASAs required that Tru Blue "hold, in a fiduciary capacity, all insurance charges or premiums collected on behalf of or for Plan Sponsor, as well as return any [excess] premiums received from Plan Sponsor."

50.     Tru Blue never obtained a TPA license as required by Georgia law before operating as a TPA for the Plans located in Georgia.

51.     Pursuant to § 33-23-101 of the Georgia Code, the Georgia Department of Insurance has authority to shut down the services of a TPA operating without a license in the State of Georgia. Therefore, Participating Plans were exposed to the further risk of losing all claims adjudication and payment services at any time.

52.     Plan Sponsors provided Tru Blue with monthly premium equivalent payments, which were comprised of three parts: (1) Administrative Fees; (2) Claims Funds; and (3) Stop Loss Premiums for that Plan Sponsor's plan.

53.     The Administrative Fees were the only part of these payments which Tru Blue was entitled to keep or use at its own discretion.

54.     The Claims Funds were deposited into bank accounts created and maintained by Tru Blue.

**D.     The Tru Blue MEWA controlled and commingled Plan Assets and operated the Participating Plans as a single MEWA.**

55.     According to the ASAs, Tru Blue was required to hold all premium

18

equivalents collected from the Participating Plan' sponsors in a fiduciary capacity, and to remit such funds immediately or deposit them into a fiduciary bank account. Additionally, all claims payments were to be authorized by the Plan Sponsor. In reality, however, Tru Blue's practices were much different.

56.    When it was first created in early May 2019, Tru Blue did not maintain separate accounts for each Participating Plan.  Rather, it commingled the Participating Plans' funds in one account.  Tru Blue deposited all funds it received from all employers, including Claims Funds and Stop Loss Premiums, into an account titled the USMGU/Nationwide Account, which was intended to hold only stop loss reimbursement payments received from Nationwide.

*June 2019 – November 2019*

57.    By June 2019, Tru Blue had established individual claims accounts at SunTrust Bank for each Participating Plan it was administering. Tru Blue, Santulli and Grabiak continued to maintain the SunTrust Bank accounts following Santulli and Grabiak's assumption of ownership and control of Tru Blue.

58.    Tru Blue set up four different account types at SunTrust Bank:

   a. the Claims Account used to fund claims payments;

   b. an account titled "Tru Blue Administrators, TPA
       USMGU/Nationwide Account" (the "USMGU Account"),

19

which was used for a variety of purposes, including receiving

the majority of monthly premium equivalents from

employers;

c.  the Operating Account; and

d.  47 individual employer fiduciary accounts, which had a

stated purpose of holding plan assets.

59.    In practice, however, Tru Blue often deposited Plan Sponsors'

monthly payment, including Claims Funds, into the USMGU Account rather than

the appropriate Participating Plan's fiduciary account. As a result, Tru Blue

commingled each type of funds from many different Plan Sponsors in the USMGU

Account.

60.    Moreover, Tru Blue failed to maintain records sufficient to reconcile

each Plan's contributions, stop-loss premiums, claims payments, and plan

expenses. As a result, Tru Blue's records failed to track which of the commingled

funds in the USMGU Account were plan assets (in the form of Claims Funds).

Similarly, Tru Blue's records failed to track which of the commingled funds in the

USMGU Account belonged to which Plan Sponsors.

61.    As a result, the Tru Blue MEWA used plan assets and non-plan assets

in the USMGU Account interchangeably. It also used Participating Plans' funds

interchangeably to pay claims and expenses incurred by other Participating Plans.

62.     Even when the Tru Blue MEWA did transfer Plan assets from the

USMGU Account to a Participating Plan's fiduciary account, it did so untimely,

often after an average delay of 55 days. Sometimes, however, it bypassed the

fiduciary accounts entirely, transferring Claims Funds directly from the USMGU

Account to the Claims Account.

*November 2019 – Present*

63.     In approximately November 2019, Tru Blue, Santulli, and Grabiak

established new accounts at Renasant Bank. When an existing Participating Plan

renewed with Tru Blue, Claims Funds contributed for the subsequent plan year

were deposited in the Renasant Bank claims account, while Claims Funds

contributed for the 2019 plan year were deposited in accounts held in SunTrust

Bank. Similarly, Claims Funds contributed by sponsors of new Participating Plans

that came under the Tru Blue MEWA beginning with the 2020 plan year were

deposited in the Renasant Bank claims account.

64.     Tru Blue maintained five accounts at Renasant Bank:

        a.  A Clearing Account;

        b.  A Claims Processing Account;

        c.  A Service Provider Account;

21

    d.  An Employer Claims Fund Account; and

    e.  An Operating Account.

65.　Tru Blue failed to maintain sufficient records to track, with any certainty, each individual Plan Sponsor's funds as they moved through the various Renasant Bank Accounts.

66.　As a result, the Tru Blue MEWA's records failed to track which of the commingled funds in the Clearing Account were plan assets (in the form of Claims Funds). Similarly, the Tru Blue MEWA's records failed to track which of the commingled funds in the Clearing Account belonged to which Plan Sponsors.

67.　The Tru Blue MEWA used some of the commingled funds, which included plan assets, held in the Renasant and Sun Trust accounts to pay service providers, vendors, and its own business expenses.

68.　Moreover, because it commingled multiple Participating Plans' Claims Funds in the same account, failed to maintain records sufficient to track which funds belonged to which Plan Sponsor, and then paid claims with those commingled funds, the plan assets of Participating Plans regularly were used to pay claims incurred by another Participating Plan.

69.　Through the foregoing actions, Tru Blue, Santulli, and Grabiak administered the Participating Plans as a single arrangement, rather than 50

individual plans. By extension, Tru Blue maintained and operated a MEWA within the meaning of 29 U.S.C. § 1002(40).

**E.    Claims Adjudication**

70.    Pursuant to the ASAs with each Participating Plan, Tru Blue was required to process, or adjudicate, the Participating Plans' medical claims.

71.    At its inception in April 2019, Tru Blue unilaterally selected Synthcare, a claims adjudication program created and operated by Synthesis Healthcare Services LLP, to preliminarily adjudicate claims, i.e., make a determination about whether and to what extent a medical claim was covered.

72.    ABMS had also used Synthcare to adjudicate claims before ABMS collapsed, leaving millions of dollars of unpaid claims. Notwithstanding that Plan Sponsors might foreseeably and reasonably object to using a service provider also used by ABMS, Tru Blue and Precour never notified the Plan Sponsors or sought their input about Synthcare servicing their Plans.

73.    In approximately March or April 2020, Tru Blue and Defendants Santulli and Grabiak selected Gary E. Ringler, Inc. d/b/a Nexcaliber ("Nexcaliber") to adjudicate claims, also without notifying the Plan Sponsors. Plan Sponsors learned of the change in service providers only after the change occurred.

74.     Defendants Tru Blue, Santulli and Grabiak authorized and submitted claims to Synthcare and Nexcaliber for preliminary adjudication. These Defendants also received the resulting preliminary adjudications.

75.     Defendants Santulli, Grabiak, and Tru Blue then paid claims according to Synthcare or Nexcaliber's determination, in effect approving those preliminary decisions.

76.     Defendants Santulli, Grabiak and Tru Blue generally approved and authorized payment of these claims without seeking approval from, or even consulting with, the Plan Sponsors.

**F.     The Tru Blue MEWA Collects Insufficient Premium Equivalents to Pay Claims**

77.     Under the Participating Plans' level-funded model, the Plan Sponsors paid regular monthly premium equivalents.  Cumulatively, the premium equivalents for a given plan year were meant to cover all of the claims incurred during that plan year that were not eligible for stop-loss coverage, with the anticipation that some months of a plan year would have more or higher claims, while others would have fewer or lower claims.

78.     According to an accounting from Synthcare, as of May 7, 2019, these 42 Participating Plans had collectively accrued approximately $1.7 million in claims from the previous months in the plan year while under ABMS.

79.     In April 2019, just before Tru Blue took over as TPA to the 42 Participating Plans, ABMS had approximately $325,000 in total assets available to pay claims for the plans destined to become the Participating Plans, as well as to pay claims for the other 76 plans it administered. The Tru Blue MEWA did not obtain any of these funds from ABMS.

80.     When Tru Blue began to administer the first 42 Participating Plans -- those which it assumed from ABMS mid-plan year -- it collected premium equivalents only from May 2019 through the end of the plan year.

81.     The Tru Blue MEWA did not have access to premium equivalents the 42 Participating Plans had paid to ABMS from January – April of 2019, those months of the plan year preceding May 2019.

82.     Tru Blue did not seek additional funding from the first 42 Participating Plans' Sponsors to make up the funding for plan year months preceding May 2019.  For instance, Tru Blue did not seek to increase the Plan Sponsors' monthly payments to account for the costs of these additional claims, nor did it require the Plan Sponsors to provide additional funds sufficient to pay for such claims prior to paying them.

83.     Yet, despite failing to receive any funds from ABMS or collecting additional funding from the Plan Sponsors, the Tru Blue MEWA began paying

run-in ABMS Claims as early as June 2019.

84.     When Defendant Santulli became Tru Blue's President on or about October 1, 2019, he continued authorizing payments from the Claims Funds to pay run-in claims without seeking additional funding to cover the claims.

85.     By December 2019, the Tru Blue MEWA paid approximately $506,066.97 in run-in ABMS Claims without any plan to make up the funding for these claims.

86.     Defendants Tru Blue, Precour, Grabiak, and Santulli did not inform the Participating Plans' Sponsors about the potential for a funding shortfall or discuss with the Plan Sponsors the need for additional funding at the time Tru Blue took over administration of the Plans or when they began to pay run-in ABMS Claims.

87.     At a minimum, twenty-two Participating Plans experienced insufficient Claims Funds to cover claims, some as early as September of 2019.

88.     Defendants Tru Blue, Grabiak, and Santulli were in a unique position to know that some Participating Plans were certain to incur funding shortfalls, because it was these Defendants who decided to use plan assets paid towards claims incurred under the Tru Blue MEWA to instead pay for run-in ABMS Claims without any strategy to shore up funding.

26

89.    The Plan Sponsors were only notified that additional funding was required as a result of Defendants Tru Blue, Santulli, and Grabiak decision to pay run-in claims by demand letters dated December 10, 2019.  At least one demand exceeded $64,000.  Defendants sent these demand letters approximately six months after Defendant Tru Blue first began to pay the run-in claims, five months after Defendants Santulli and Grabiak bought interests in and began to participate in the Tru Blue MEWA's operation, and three months after unpaid claims began to accumulate in some of the Participating Plans.

### G.    Participating Plans Accrue Unadjudicated, Unpaid Claims

90.    During the time that Defendants Tru Blue, Santulli, and Grabiak exercised direct authority over claims adjudication for the Participating Plans, they caused an estimated $2 million to $3.67 million in medical claims to remain unadjudicated and, therefore, unpaid.

91.    In some instances, Tru Blue, Santulli and Grabiak decided to stop sending claims for adjudication because the Plan Sponsors did not provide additional funding – in addition to their monthly premium equivalents – for their Plans when requested.

92.    However, the ASAs contain no provision conditioning the processing of claims on the availability, or lack thereof, of Claims Funds.

27

93.    Defendants Tru Blue, Santulli, and Grabiak also failed to have adequate systems in place to process claims, resulting in further delays and unpaid claims.

94.    As a result of Defendants' decision to pay run-in claims without obtaining funding for those claims, many individual participants and beneficiaries have had eligible claims go unpaid. Many of these individuals have faced collections, paid the claims themselves, and/or foregone additional medical treatment to avoid further claims going unpaid.

95.    Approximately $400,000 of medical claims incurred between May 1, 2019 and December 2019 for approximately 22 Participating Plans remain unpaid because Tru Blue, Grabiak, and Santulli misappropriated premium equivalents paid to the Tru Blue MEWA to pay for ABMS Claims.

**H.    The Fiduciaries' Self-Dealing and Disloyal Transactions**

96.    Precour is a co-owner of Tru Blue and of USMGU.

97.    Precour and USMGU unilaterally selected Precour's own company, Tru Blue, to be the TPA for the Participating Plans.

98.    As referenced *supra* at paragraph 32, USMGU received monthly fees from the Participating Plans.  These fees were paid per the following arrangement: USMGU had an agreement with Nationwide, the stop loss carrier, pursuant to

which USMGU took its monthly fees from the money earmarked as stop-loss premiums before remitting the balance to Nationwide as premiums.  As noted above, the premiums for the stop loss coverage were paid with employee contributions from commingled accounts using plan assets. During the relevant time period, USMGU retained $494,821.83 in marketing fees and underwriting and administrative fees from Participating Plans' assets paid to Nationwide for stop loss coverage.

99.    Neither Precour nor USMGU adequately disclosed this fee arrangement with Nationwide to the Participating Plans or their Sponsors.

100.   Upon information and belief, USMGU and its owner Precour, both fiduciaries to the Tru Blue MEWA and Participating Plans, directly benefited from these transfers of plan assets to USMGU.

101.   Upon information and belief, to the extent USMGU provided necessary services to the True Blue MEWA and Participating Plans, the fees it received were not disclosed and were in excess of reasonable compensation.

102.   Defendant Santulli is the owner of Advanced Diabetic, Advanced Pharmacy, and Rx Valet.

103.   Defendant Grabiak is the owner of the Agency of North Georgia.

104.   Defendants Santulli and Grabiak are owners of Alternative Benefit

Collective.

105.   From July 18, 2019 to February 28, 2021, Defendants Tru Blue, Santulli and Grabiak caused the Tru Blue MEWA to transfer $297,159.23 in plan assets to Santulli, Advanced Diabetic, Advanced Pharmacy, and Rx Valet, all parties in interest to the Tru Blue MEWA and Participating Plans.

106.   From May 31, 2019 to February 28, 2021, Defendants Tru Blue, Santulli and Grabiak caused the Tru Blue MEWA to transfer $17,150.34 in plan assets to Grabiak and the Agency of North Georgia, parties in interest to the Tru Blue MEWA and Participating Plans.

107.   From December 17, 2019 through January 2020, Tru Blue, Grabiak and Santulli caused the Tru Blue MEWA to transfer $62,500 in plan assets to ABC, a party in interest to the Tru Blue MEWA and Participating Plans.

108.   Upon information and belief, Defendants Santulli and Grabiak, fiduciaries to the Tru Blue MEWA and Participating Plans, directly benefited from these transfers of plan assets to themselves and to the companies they owned.

109.   Upon information and belief, to the extent Advanced Diabetic, Advanced Pharmacy, Rx Valet, Agency of North Georgia, and ABC provided necessary services to the Tru Blue MEWA and Participating Plans, the fees they received were in excess of reasonable compensation.

## FIRST CLAIM FOR RELIEF
### Against Defendants Tru Blue, Santulli and Grabiak
### Prohibited Transactions
### Prohibited Self-Dealing
### Breach of duties of loyalty and prudence

110.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference all preceding allegations of this Complaint.

111.   Grabiak and Santulli were signatories on Tru Blue bank accounts and directed all financial decisions and payments from those bank accounts.

112.   As fiduciaries to the Tru Blue MEWA and the Participating Plans, DefendantsTru Blue, Santulli and Grabiak were prohibited from dealing with the assets of the Participating Plans in their own interest or account, or from acting in any transactions involving the Tru Blue MEWA and the Participating Plans on behalf of a party whose interests were adverse to the interests of the plan or the interests of its participants and beneficiaries in violation of § 406(b)(1)-(2) of ERISA, 29 U.S.C. § 1106(b)(1)-(2).

113.   As fiduciaries to the Tru Blue MEWA and the Participating Plans, Defendants Tru Blue, Santulli and Grabiak were prohibited from causing the Plans to engage in transactions they knew or should have known constitute a direct or indirect furnishing of services between the Plans and a party in interest or a

31

transfer to a party in interest of any asset of the plan, in violation of § 406(a)(1)(C)-(D) of ERISA, 29 U.S.C. § 1106(a)(1)(C)-(D).

114.   Santulli, Advanced Diabetic, Advanced Pharmacy, Rx Valet, Grabiak, ABC, and the Agency of North Georgia are parties in interest to the Tru Blue MEWA and the Participating Plans.

115.   Defendant Santulli is the owner of Advanced Diabetic, Advanced Pharmacy, and Rx Valet.

116.   Defendant Grabiak is the owner of the Agency of North Georgia.

117.   Defendants Santulli and Grabiak are owners of ABC, which has an ownership interest in Tru Blue.

118.   By transferring plan assets to Santulli, Advanced Diabetic, Advanced Pharmacy, Rx Valet, Grabiak, ABC, and the Agency of North Georgia, Defendants Tru Blue, Santulli and Grabiak:

> a.  caused the Participating Plans to engage in transactions which they
>     knew constituted a direct or indirect furnishing of goods or
>     services between the Plans and a party in interest, and for which no
>     exemption applies, in violation of ERISA § 406(a)(1)(C), 29
>     U.S.C. § 1106(a)(1)(C);
>
> b.  caused the Participating Plans to engage in transactions which they

knew constituted a direct or indirect transfer to, or use for the benefit of a party in interest of assets of the Plans, and for which no exemption applies, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D);

c.  acted on behalf of a party whose interests were adverse to the interests of the Participating Plans covered by the Tru Blue MEWA or the interests of their participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

d.  engaged in prohibited self-dealing by using the Participating Plans' assets to pay themselves through their respective companies in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1).

e.  failed to act prudently and solely in the interests of the Participating Plans and their participants and beneficiaries, in violation of ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B).

119.  As a result of the foregoing breaches, Tru Blue, Santulli and Grabiak caused injury to the Participating Plans for which they are jointly and severally liable pursuant to ERISA section 409(a), 29 U.S.C. § 1109(a).

**SECOND CLAIM FOR RELIEF**
**Against Precour and USMGU**

33

**Prohibited Self-Dealing**
**Breach of duties of loyalty and prudence**

120.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the
Secretary adopts and incorporates by reference all preceding allegations of this
Complaint.

121.   As fiduciaries to the Participating Plans covered by the Tru Blue
MEWA, Defendants Precour and USMGU had a duty to act prudently and solely
in the interest of the Participating Plans. ERISA sections 404(a)(1)(A)-(B), 29
U.S.C. §§ 1104(a)(1)(A)-(B). Precour and USMGU further were prohibited from
dealing with the assets of the Participating Plans in their own interest or account, or
from acting in any transactions involving the Tru Blue MEWA and the
Participating Plans on behalf of a party whose interests were adverse to the
interests of the plan or the interests of its participants and beneficiaries in violation
of § 406(b)(1)-(2) of ERISA, 29 U.S.C. § 1106(b)(1)-(2).

122.   Defendant Precour is a fiduciary to the Participating Plans, the
Executive Vice President of USMGU and a party in interest to the Tru Blue
MEWA and the Participating Plans under ERISA Sections 3(14)(A) and (H), 29
U.S.C. § 1002(14)(A) and (H).

123.   Precour and USMGU are each a fiduciary and party in interest to the
Tru Blue MEWA and the Participating Plans under ERISA Sections 3(14)(A) and

34

(B), 29 U.S.C. § 1002(14)(A) and (B).

124.   Precour and USMGU unilaterally selected Precour's own company, Tru Blue, to be the TPA for the Participating Plans.

125.   By selecting Tru Blue to be a service provider to the Participating Plans, Defendants Precour and USMGU acted on behalf of a party whose interests were adverse to the interests of the Participating Plans or the interests of their participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

126.   Defendant Precour engaged in prohibited self-dealing by using the Participating Plans' assets to pay himself through Tru Blue and the Tru Blue MEWA, in violation of ERISA §406(b)(1), 29 U.S.C. §1106(b)(1).

127.   Defendant USMGU engaged in prohibited self-dealing by using the Participating Plans' assets to pay itself from funds forwarded to Nationwide for stop loss coverage, without the knowledge or approval of the Plan Sponsors, in violation of ERISA §406(b)(1) and (2), 29 U.S.C. §1106(b)(1) and (2).

128.   In their selection of Tru Blue as TPA and their acceptance of undisclosed fees, Defendant Precour and USMGU failed to act prudently and solely in the interests of the Participating Plans and their participants and

beneficiaries, in violation of ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B).

129.   Precour and USMGU further breached their duty of prudence in selecting then failing to monitor Tru Blue to be the Participating Plans' third party administrator. Had Precour or USMGU made even a cursory investigation of Tru Blue, they would have learned that it was not prepared to effectively operate as a TPA for the Participating Plans at the time they selected it as ABMS' replacement or at the time it began administering the Plans. Therefore, their selection of Tru Blue to administer the Participating Plans, despite Tru Blue's inability to do so, violated their duty of prudence to the Participating Plans, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

130.   As a result of the foregoing breaches, Precour and USMGU caused injury to the Participating Plans for which they are jointly and severally liable pursuant to ERISA section 409(a), 29 U.S.C. § 1109(a).

**THIRD CLAIM FOR RELIEF**
**Against Precour, Santulli, Grabiak, and Tru Blue**
**Breaches of duties of loyalty and prudence**

131.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference all preceding allegations of this Complaint.

132.   Tru Blue, Precour, Santulli and Grabiak were each a fiduciary to the Participating Plans covered by the Tru Blue MEWA at all relevant times.

133.   As fiduciaries to the Participating Plans covered by the Tru Blue MEWA, Tru Blue, Precour, Santulli and Grabiak had a duty to act prudently and solely in the interests of the Participating Plans and their participants and beneficiaries. These duties required them to, among other things, develop and implement reasonable procedures to effectively process, trace, and manage each Participating Plan's funds and assets; implement adequate systems to allow the Tru Blue MEWA to efficiently and effectively pay claims; maintain and provide to Plan Sponsors adequate records regarding their respective Participating Plans, including claims funding; prudently manage and use each Participating Plans' claims funds for the sole use of that Participating Plan; and effectively communicate with Plan Sponsors regarding the claims funds. Tru Blue, Precour, Santulli and Grabiak failed in each of these respects.

134.   Santulli, Grabiak, Precour, and Tru Blue diverted Claims Funds reserved for Tru Blue Claims to pay ABMS run-in claims without notifying or obtaining permission from Plan Sponsors for affected Participating Plans, resulting in the accumulation of unpaid claims.

135.   Santulli, Grabiak, Precour, and Tru Blue knew or should have known

that Participating Plans had insufficient funding to pay medical claims for all of their participants and beneficiaries because they knew they were diverting Tru Blue MEWA Claims Funds to pay the ABMS run-in claims and further knew that The Tru Blue MEWA did not have access to premium equivalents paid to ABMS.

136.   Santulli, Grabiak, Precour, and Tru Blue failed to notify the Plan Sponsors regarding the diverted funds to pay ABMS Claims and failed to obtain funding from Plan Sponsors or from any other source until December 10, 2019, months after Participating Plans began to accrue unpaid claims.  By this time, Tru Blue calculated a funding shortfall of $576,823.48 and could not pay current claims for some of the Participating Plans.

137.   Santulli, Grabiak, Precour, and Tru Blue failed or refused to timely process or adjudicate claims, resulting in over $3 million in unadjudicated, unpaid claims

138.   Tru Blue failed to have reasonable procedures and processes in place to manage each Participating Plan's funds and assets, including to process and pay claims, at the time it took over administration of the Participating Plans and for months afterward. As a result, claims were not timely processed or paid, and the Participating Plans' premium equivalents were used indiscriminately and not solely in the interest of the individual Participating Plans' participants and beneficiaries.

As a result of late or unpaid claims, numerous participants and beneficiaries have been harmed because their bills were sent to collection as a result of lack of payment, negatively impacting their credit score, and they have foregone other medical treatments out of fear that they, too, would go unpaid. By the actions and failures to act as described above, Defendants Santulli, Grabiak, Precour, and Tru Blue:

    a.  failed to act solely in the interest of the participants and beneficiaries of the Participating Plans covered by the Tru Blue MEWA and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

    b.  failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

**<u>FOURTH CLAIM FOR RELIEF</u>**
**Against all non-plan Defendants**
**Failure of Duty to Monitor and Co-fiduciary Liability**

137.   Pursuant to Rule 10(c) of the Federal Rules of Civil Procedure, the Secretary adopts and incorporates by reference all preceding allegations of this Complaint.

138.   Defendants Tru Blue, Precour, USMGU, Santulli, and Grabiak each imprudently failed to monitor the actions of the others.

139.   Each fiduciary's failure to monitor the others enabled the others to breach their fiduciary duties as described in Claims for Relief 1 – 3, above.

140.   By failing to monitor the other fiduciaries, Defendants Tru Blue, Precour, USMGU, Santulli and Grabiak each failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

141.   Moreover, Defendants Tru Blue, Precour, USMGU, Santulli, and Grabiak are each liable for the breaches each enabled by his or its failure to monitor the other fiduciaries in violation of § 405(a)(2) of ERISA, 29 U.S.C. § 1105(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, pursuant to §§ 502(a)(2) and (5) of ERISA, 29

U.S.C. §§ 1132(a)(2) and (5), Plaintiff prays that the Court:

A.  Appoint an Independent Fiduciary to take over plan administration, process all unprocessed claims, submit all stop loss claims, and make appropriate distributions of proceeds from this litigation;

B.  Order Defendants Tru Blue, USMGU, Precour, Santulli, and Grabiak to provide to the Independent Fiduciary all documents, records, accounts, or other information required to administer and manage the Participating Plans, including those that are no longer being administered by Tru Blue;

C.  Hold Defendants Tru Blue, USMGU, Precour, Santulli, and Grabiak jointly and severally liable for all losses to the Participating Plans caused by the ERISA violations described here, plus prejudgment and post judgment interest;

D.  Require Defendants Tru Blue, USMGU, Precour, Santulli, and Grabiak to disgorge all fees and/or profits received as a result of the prohibited transactions under ERISA, plus prejudgment and post judgment interest;

E.  Require Defendants Tru Blue, USMGU, Precour, Santulli, and Grabiak to pay all unpaid or unprocessed claims;

F.  Require Defendants Tru Blue, USMGU, Precour, Santulli, and Grabiak to jointly and severally pay all fees and expenses of the Independent Fiduciary for the Participating Plans;

41

G. Permanently enjoin Defendants Tru Blue, USMGU, Precour, Santulli, and Grabiak and anyone acting on any Defendant's behalf, including agents, employees, assigns, subsidiaries, affiliates, attorneys, and any other party acting in concert with them or at his direction, from ever acting as a fiduciary or service provider to any plan covered by Title I of ERISA and from marketing or enrolling any employers, professional employer organizations, or participants in any ERISA-covered health plan;

H. Permanently enjoin Defendants Tru Blue, Precour, USMGU, Santulli, and Grabiak from violating Title I of ERISA;

I.   Award Plaintiff the costs of this action; and

J.   Grant such other relief as may be equitable, just, and proper.

ADDRESS:

Office of the Solicitor
U. S. Department of Labor
61 Forsyth Street, S.W.
Room 7T10
Atlanta, GA 30303
(404) 302-5435
(404) 302-5438 (FAX)

Office of the Solicitor
U.S. Department of Labor

SEEMA NANDA
Solicitor of Labor

TREMELLE I. HOWARD
Regional Solicitor

LYDIA J. CHASTAIN
Acting ERISA Counsel
Georgia Bar No. 142535

s/*Daniel P. Miller*
DANIEL P. MILLER
Trial Attorney
Georgia Bar No. 463643

Attorneys for Plaintiff

SOL Case No. 20-00082

***Secretary v. The Tru Blue MEWA, et al.***
**Appendix A: 50 Participating Plans**

1. Advanced Automation Consulting
2. Advanced Electrical & Industrial Supply
3. All Budget Mechanical Services, Inc. DBA Mr. Rooter Mr. Electric
4. Animal Medical Center of Lehigh Acres, Inc.
5. ArcLabs LLC DBA ArcLabs Welding School
6. Auth Consulting & Associates Inc.
7. BHH Partners
8. Bennett Equipment & Supply Co Inc.
9. Bryan & Bryan Inspections
10. CBS Distribution
11. Carport Central
12. Coker Pediatrics, LLC
13. Common Sense Office Furniture
14. Continental NH3 Products Company
15. D&A Building Services, Inc.
16. D'Andrea Provisions, Inc.
17. DFW Salons, LLC
18. Elder Cedar Creek
19. F A Peinado LLC
20. Gilbert Anuez, Inc. DBA Accurate Pavers
21. Gossett Concrete & Pipe Company
22. Gulf Coast Commercial Corp
23. Healthmap Solutions, Inc.
24. Hoops Electric Service Inc.
25. Low Carb High Fat, LLC

26. Maali Enterprises, Inc.

27. Mark Allen Transportation

28. Milton Hall Surgical Associates

29. Mortgage Financial Group, Inc.

30. Muenster Gainesville Banking Center

31. NAPCO, Inc. (which includes Vulcan Information Packaging)

32. NextStep Recruiting

33. No Mas Cantina, Inc.

34. Osbourne Purdie, LLC

35. PeachCap

36. Sean McCutcheon's Air Conditioning & Heating, Inc.

37. Shiloh Hills Baptist Church

38. Southeast Service Group LLC

39. Temperature Controls

40. Tropical Construction Supply

41. Valdosta Country Club

42. Xsunt Corporation

43. Advanced Pharmacy

44. DBH Printing

45. Ennis Ground Transportation, Inc.

46. Exclusive Courier Service

47. Liberty Package Service, Inc.

48. Local 947 Health and Welfare Fund

49. Metcalf Industrys DBA Mike's Auto Glass

50. Patton Logistics Inc.